

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-17-2008

# USA v. Fake

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-1284

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Fake" (2008). *2008 Decisions.* Paper 1435.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1435

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-1284

———

UNITED STATES OF AMERICA

v.

CLIFFORD FAKE,

Appellant

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 1:05-cr-00426)
District Judge: Honorable William W. Caldwell

———

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 14, 2008

Before: FUENTES, CHAGARES, and VAN ANTWERPEN, <u>Circuit Judges</u>.

(Filed March 17, 2008)

———

OPINION OF THE COURT

———

VAN ANTWERPEN, *Circuit Judge*.

Appellant Clifford Fake appeals the 218-month sentence he received following his

guilty plea to a charge of health care fraud resulting in serious bodily injury to others.

Fake argues that the District Court erred in calculating his advisory Guidelines range. For

the reasons set forth below, we will affirm the District Court's sentence.

## I.

Because we write solely for the benefit of the parties, we will set forth only those facts necessary to our analysis.

Appellant Clifford Fake was charged in an October 26, 2005 indictment with health care fraud resulting in serious bodily injury, pursuant to 18 U.S.C. § 1347, and with criminal forfeiture, pursuant to 18 U.S.C. § 982(a)(7) and 28 U.S.C. § 246(c). Fake entered into a plea agreement with the Government and pled guilty to these charges on April 20, 2006. In anticipation of sentencing, a Pre-Sentence Report ("PSR") was prepared.

On January 24, 2007, the District Court held a hearing to consider evidence relating to the calculation of Fake's Guidelines range and to address Fake's objections to the PSR. At the hearing, the Government offered documentary evidence and the testimony of Special Agent Brockman, the agent who investigated the fraud. The evidence adduced at that hearing and contained in the PSR revealed that Fake and his wife, Tina, began operating a residential home for care-dependent and elderly individuals in the fall of 2000. The home was called the Reaching Out Personal Care Home ("Reaching Out") and was located in Lebanon County, Pennsylvania. In order to run Reaching Out, the Fakes applied to three government programs that reimbursed such homes for the care they provided. These programs, which were operated by agencies of the Commonwealth of Pennsylvania, were designed to allow homes to provide residential

1

care for persons who are care-dependent and have limited financial resources. The programs required that Fake submit an application in order to qualify for reimbursements. At least one of the programs required Fake to disclose whether he had ever been convicted of a "serious crime." Fake stated that he had not, despite having numerous criminal convictions, including two for aggravated assault. Agent Brockman testified that program officials would not have certified Fake had they known this information. As part of their participation in the programs, the Fakes also had to submit plans detailing the care they would provide and their recognition of the standards of care required by the programs.

From 2000 to 2005, Reaching Out cared for 21 care-dependent individuals and employed 6 care-givers, not including the Fakes. Of the 21 patients, 20 received medical benefits either through the various programs or through funding paid directly to the patient by the Veterans Administration or Social Security. Fake and his wife were the supervisors and managers of the home. Fake was largely responsible for preparing time sheets indicating the hours worked by the employees and the care provided. These time sheets had to be approved by the care-giver and the patient. Once approved, the time sheets were sent to the various programs and the Fakes received money for the care given. Over the course of the time the Fakes ran their operation, they received $236,853.21 from the compensation programs. The money was paid, according to the evidence introduced by the Government, with the understanding that the Fakes were providing adequate care and were accurately listing the hours worked by each employee. According to the

Government's evidence, Fake and the other employees routinely falsified the time sheets, often overstating the amount of care provided, stating that hours were worked when in fact no care-giver was on duty, and covering up the substandard care and neglect suffered by the patients. Fake also had stamps of some of the patients' signatures made. These signature stamps were used to "sign" the time sheets, rather than having the patient sign the form.

In addition to the falsification of the time sheets, Fake and his associates also tolerated, and in some cases perpetrated, the neglect and abuse of the patients at Reaching Out. Although the staff at the home was required to submit a plan detailing the care the home would provide, the care at Reaching Out fell far below the standards they agreed to uphold.[1] As many as ten patients, according to the PSR, suffered bodily harm as a result of being neglected and abused by Fake and others. These acts of neglect and abuse included ignoring patients' complaints of pain, verbally abusing patients, refusing to provide medical care, covering up the circumstances surrounding the death of one patient, physically assaulting patients, and failing to clean patients or provide them with sanitary living conditions. In one such case, a patient reported that Fake himself had thrown him into a room, breaking the patient's arm. The evidence also revealed that Fake made some of the elderly patients shovel snow and stuff newspapers for his paper route. Fake and others also provided improper and inadequate diets for the patients, serving snack cakes

---

[1]For example, one patient reported that she was locked in a basement and received only one half-hour of care a day.

to a diabetic patient, forcing a patient to eat off the floor, and serving discarded and expired food retrieved from grocery store dumpsters.

In addition to these abusive and neglectful acts, patients reported that Fake and others took the pain medications meant for patients and diverted them to their own use. According to the evidence, Fake also forged and executed documents and falsely received funding from a church organization by failing to provide information relating to a patient. Additionally, Fake withheld certificates of deposit in excess of $60,000 that belonged to a patient, and had no intention of returning them.

In the spring of 2005, when investigators became aware of the conditions and abuse at Reaching Out, they obtained and executed search warrants and interviewed patients. Four employees were charged with misprision of a felony and ultimately pled guilty. Fake was aware of the investigation, but he continued to prepare false time sheets until authorities obtained a second search warrant for Fake's residence. Upon searching his house, authorities discovered falsified time sheets listing hours of care that were to be performed on dates in the future, as well as the signature stamps. They also discovered pain medications taken from patients. Fake was charged in the Lebanon County Court of Common Pleas with multiple counts of abuse, neglect, and assault based on his actions involving seven of the patients. Fake pled guilty to these charges and was sentenced to up to 20 years in prison.

Following the conclusion of the evidence offered by the Government at the pre-sentencing hearing, Fake testified that he was not responsible for what went on at

4

Reaching Out and that he did not falsify the time sheets or abuse the patients. He also testified that the guilty pleas to neglect and abuse of the patients he entered in Lebanon County were involuntary. His objections to the PSR and the sentence calculation rested almost entirely on his testimony. The judge, after hearing Fake's testimony and noting the contradictions with the record, found Fake not credible. The judge expressly adopted the PSR and the facts it detailed.

After hearing the evidence and reviewing the PSR, the District Court determined that Fake's criminal history score was V and his un-enhanced offense score was 7, resulting in an advisory Guidelines range of 12-18 months imprisonment.[2] The PSR recommended that Fake's offense level be adjusted upward based on the following Guidelines adjustments: § 2B1.1(b)(1)(G) (12-level increase based on $236,853.21 amount of loss); § 2B1.1(b)(2)(A)(i) (2-level increase for offense involving 10 or more victims); § 2B1.1(b)(12)(A) (2-level increase for conscious or reckless risk of bodily injury or death); § 3A1.1(b)(1) (2-level increase for vulnerability of victims); § 3A1.1(b)(2) (2-level increase because offense involved large number of vulnerable victims); § 3B1.1(a) (4-level increase for leadership role); § 3B1.3 (2-level increase for abuse of trust); and § 3C1.1 (2-level increase for obstruction of justice). With all of the adjustments, Fake's offense level was 35, and his advisory Guidelines range was 262-327

---

[2]Fake's sentencing range was calculated based on the 2006 version of the Sentencing Guidelines. Thus, all references to the Guidelines in this opinion will be to the 2006 version unless otherwise specified.

months.  The statutory maximum penalty for the crime to which Fake pled guilty was 240

months, however, which made this the Guidelines sentence to which Fake was exposed.

The District Court ultimately adopted the PSR's recommendations and determined his

sentence based on an offense level score of 35.  The District Court sentenced Fake to 240

months, but subtracted the time he had already served in Lebanon County prison, thus

resulting in a sentence of 218 months.  The District Court also ordered that Fake pay

restitution in the amount of $236,853.21.  Fake timely appealed the District Court's

calculation of his Guidelines range.[3]

## II.

The United States District Court for the Middle District of Pennsylvania had

jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231.  This Court has

appellate jurisdiction pursuant to 28 U.S.C. § 1291.

Fake challenges the applicability of the various sentencing adjustments used to

calculate his ultimate Guidelines range.  We review for clear error the factual findings

used by the District Court to support the application of a sentencing adjustment.  *See*

*United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).  These factual

---

[3]In this appeal, Fake does not challenge the application of the adjustments set forth in §§ 2B1.1(b)(12)(A), 3A1.1(b)(1), or 3A1.1(b)(2).  Although he has therefore waived any challenge to those adjustments, we hold that the District Court did not commit clear error when applying those adjustments.

findings must be supported by a preponderance of the evidence.[4]  *See Grier*, 475 F.3d at 568.

III.

Fake challenges the District Court's calculation of the amount of the loss resulting from Fake's fraud and the District Court's factual findings supporting the application of the sentencing adjustments set forth at U.S.S.G §§ 2B1.1(b)(2)(A)(I), 3B1.1, 3B1.3, and 3C1.1.  We will address each of Fake's arguments in turn.

*A.  Amount of Loss*

Fake contends that the District Court erred in calculating his advisory Guidelines range by setting the amount of loss resulting from his fraudulent activities at $236,853.21.[5]  Pursuant to U.S.S.G. § 2B1.1, if the amount of loss resulting from

---

[4]Fake contends that the appropriate standard is the "clear and convincing" standard and cites to our decision in *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990).  In our recent decision in *Grier*, however, we stated clearly that the "preponderance of the evidence" standard is the appropriate standard.  *See Grier*, 475 F.3d at 568.  We also distinguished *Kikumura* and noted that that decision may not be applicable in the post-*Booker* era.  *See id*. at 568 n.8.

[5]In his brief, Fake repeatedly refers to this amount as the amount of "restitution," though he appears to be challenging the use of the amount for the purposes of calculating the advisory Guidelines range, which makes it the "amount of loss."  If indeed Fake is challenging the District Court's decision to require him to pay this amount as restitution, we hold that the District Court did not err in ordering restitution.  Restitution was permitted as a matter of law in this fraud case, and the District Court did not abuse its discretion when it set the amount of restitution at $236,853.21, which was the total amount the agencies paid out to Fake under false pretenses.  *See United States v. Fallon*, 470 F.3d 542, 548 (3d Cir. 2006) (discussing when restitution is appropriate); *see also* 18 U.S.C. §§ 3663A, 982(a)(7) (relating to forfeiture of fraudulently obtained assets); *United States v. Lessner*, 498 F.3d 185, 201 (3d Cir. 2007) (discussing restitution calculation).

fraudulent activity is between $200,000 and $400,000, the defendant's offense score should be increased by 12 points. *See* U.S.S.G. § 2B1.1. Because the amount of loss for the purposes of the § 2B1.1 adjustment is a factual determination, we will only reverse the District Court's findings where we are "left with the definite and firm conviction that a mistake has been committed." *See Grier*, 475 F.3d at 570. *See also United States v. Jiminez*, 513 F.3d 62, 86 (3d Cir. 2008) (noting that findings as to amount of loss must be supported by a preponderance of the evidence); *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007) (same).

Fake argues that the Government did not meet its burden of persuading the District Court that he is responsible for the total loss suffered by the various compensation programs. *See Appellant's Br.* at 24. As we explained in our recent decision in *Jiminez*, "once the Government makes out a *prima facie* case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate." *Jiminez*, 513 F.3d at 86 (citing *United States v. Geevers*, 226 F.3d 186, 193 (3d Cir. 2000)). The Government demonstrated that Fake lied on his application and would otherwise not have been eligible for reimbursement from the programs. The Government also introduced evidence that Fake did not provide the level of care that he was required to provide under the programs' guidelines, including evidence of his guilty pleas in Lebanon County to charges that he neglected or assaulted some of the patients in his care. The falsified time sheets further reveal that Fake was being reimbursed for care that he either did not render or rendered in a shoddy and

8

unprofessional manner. Finally, the Guidelines permitted the District Court to impose the entire loss resulting from a "jointly undertaken criminal activity" on Fake as the result of reasonably foreseeable acts or omissions of others. *See* U.S.S.G. § 1B1.3(a)(1)(B). Given the evidence that Fake would not have been eligible for reimbursement had the programs been aware of the false statements on the application, the falsified time sheets, the substandard care being rendered, and the neglect and abuse suffered by the patients, the Government made out a *prima facie* case for holding Fake responsible for the entire amount paid out by the various programs.

In order to satisfy his burden, then, Fake must present evidence that the Government's calculation is inaccurate or incomplete. Fake testified that he was not responsible for the care of the neglected patients. He also suggested both in his testimony and in his responses to the PSR that he did not falsify the time sheets, that his guilty pleas in the state court were involuntary, and that someone else provided the negative response about his criminal history on the application form. Fake also seems to argue that the fact that the Government did not demonstrate how many of the hours listed on the time sheet reflected actual care provided to the patients demonstrates that the Government's loss calculation is incorrect. He did not offer any evidence at the hearing, however, other than his testimony, to demonstrate the actual amount of care given. Given the contradictions and inconsistencies in Fake's testimony, the District Court did not err when it deemed Fake's testimony not credible. *See App.* at 180-81. Thus, Fake has not met his burden of producing evidence to demonstrate why the calculation of the amount of loss offered by

9

the Government was incorrect.

The District Court's calculation of the amount of loss was not clearly erroneous. Had Fake revealed his criminal history or had the compensation programs discovered the abuse and neglect suffered by Fake's patients, he would not have received any of the money ultimately paid out by the programs. The District Court thus did not err in enhancing Fake's offense level pursuant to U.S.S.G. § 2B1.1 based on its determination that the total loss for which Fake was responsible was the entire amount paid out by the programs.

*B. Number of Victims*

Fake next contends that the District Court erred when it rejected Fake's objection to the PSR and adopted the Probation Department's determination that there were ten or more victims of Fake's crimes. Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), if a defendant's offense involves ten or more victims, the defendant's offense score should be raised by two points. The Application Notes to § 2B1.1 define "victim" to mean "any person who sustained any part of the actual loss" or "any individual who sustained bodily injury as a result of the offense." U.S.S.G. § 2B1.1(b)(2)(A)(i) cmt. n.1.

The Government offered evidence to demonstrate that the three programs paid money to Fake, who likely would have been ineligible for compensation absent the false statements on his application, for substandard care that otherwise would not have been reimbursable absent the falsified time sheets. Thus, these programs were three victims of the fraud. Additionally, the programs were funded by the United States Department of

10

Health and the Pennsylvania Department of Public Welfare. The District Court did not err when it determined that these two agencies were victimized, as the agencies would not have paid the money to the programs absent Fake's fraud. Furthermore, according to evidence adduced at the sentencing hearing, almost all of the fifteen patients who did not qualify for the compensation programs received money for care directly from the Veterans' Administration or Social Security.[6] They turned this money over to Fake and his associates in exchange for the care that Fake held himself out as being able to provide. The evidence in the record supports the conclusion that these people were defrauded into relinquishing this money in exchange for care that was at best substandard, and at worst non-existent.

In addition to the financial losses suffered by the three programs, two state agencies, and approximately fifteen patients who were receiving benefits directly from the government, the evidence in the record supports the conclusion that at least seven patients suffered bodily harm resulting from abuse or neglect, according to Fake's guilty pleas in the Lebanon County Court of Common Pleas; six of these patients were participants in the various programs. In addition to the abuse and neglect for which he was convicted in Lebanon County, there is evidence in the record that at least three other persons suffered abuse and neglect as a result of Fake's actions. Thus, at least ten

---

[6]The Government did not include the amount of money these agencies paid directly to the patients for medical care in the calculation of the total loss. *See App.* at 51-52.

11

patients suffered bodily harm in the form of abuse and neglect as a result of the fraud

perpetrated by Fake.[7]

In sum, there is sufficient evidence in the record to support the District Court's

conclusion that there were at least ten victims of Fake's fraud. As such, the District Court

did not clearly err in enhancing Fake's offense score pursuant to § 2B1.1(b)(2)(A)(i).

*C. Leadership Role*

Fake also challenges the District Court's upward adjustment of his offense score

based on his leadership role in the fraud. Pursuant to U.S.S.G. § 3B1.1(a), a defendant's

offense level can be increased by four levels if "the defendant was an organizer or leader

of a criminal activity that involved five or more participants or was otherwise extensive."

*See* U.S.S.G. § 3B1.1(a). According to the Guidelines, the phrase "organizer or leader"

does not necessarily mean that the defendant must be the sole or primary leader of the

activity; a person who exercises management responsibility, is involved in recruiting for

the activity, or oversees some or all of the participants in the crime can receive the four-

level adjustment set forth in § 3B1.1(a). *See* U.S.S.G. § 3B1.1(a) cmt. n.2, n.4.

With regard to the number of participants in the fraud, the District Court did not

---

[7]Fake attempted at the sentencing hearing to narrow the scope of his culpability by arguing that he was not responsible for the care of many of those who suffered neglect or bodily harm. However, pursuant to U.S.S.G. § 1B1.3, the District Court was entitled to consider the conduct of Fake's associates in determining Fake's sentence, provided that the harm suffered by the patients was a reasonably foreseeable harm or injury arising from the fraud. Here, there is sufficient evidence in the record to conclude that these harms were reasonably foreseeable.

12

clearly err when it adopted the statements in the PSR and found that there were seven participants in the fraud scheme, not including Fake. *See App.* at 80; PSR. ¶ 5. With regard to his role in the fraud, Fake argues that it was his wife who was the leader and organizer of the scheme. Although he had a higher position than some of the other employees of the care center, Fake argues, he was subordinate to his wife. *See App. Br.* at 28-29. The information elicited at the sentencing hearing, as well as documents offered as proof of the fraud, reveal that Fake was the person who prepared the false time sheets that were submitted for compensation. *See App.* at 80, 162-63. The employees who pled guilty in prior proceedings acknowledged that the time sheets prepared by Fake were inaccurate in terms of the hours actually spent serving the patients. *See id.* Fake signed off on some of the hours listed on the time sheets, and in some cases used signature stamps to forge the signatures of other employees or patients in order to submit the time sheets to the various programs. *See id.* Additionally, testimony revealed that Fake's name was on the checks used by Reaching Out and that there were entries, in handwriting identified as belonging to Fake, in the ledger listing Reaching Out's financial holdings. *See id.* at 81-83. Thus, Clifford Fake held himself out as one of the principal operators of Reaching Out. *See id.* at 84. Finally, Fake admits that the time sheets he submitted for reimbursement, which list him as having provided 2,644 hours of care to patients, overestimate the amount of care he provided. *See id.* at 161-62 ("My [Fake's] testimony is that I did not give care to anyone at 700 North Railroad.").

Given that the *modus operandi* of the conspirators in this case was to submit

13

inaccurate time sheets in order to secure compensation for care that was either not provided or was provided in a substandard manner, Fake's role as the bookkeeper and preparer of the time sheets that were submitted for reimbursement was central to the scheme. Thus, the District Court's determination that Fake was a leader of the operation for the purposes of § 3B1.1(a) was supported by a preponderance of the evidence, and the District Court's upward adjustment of Fake's offense score was not error.

## D. Abuse of Position of Trust

Fake also challenges the District Court's upward adjustment of his offense score based on his abuse of a position of trust. According to U.S.S.G. § 3B1.3, a defendant's offense level may be increased if "the defendant abused a position of public or private trust." U.S.S.G. § 3B1.3. In reviewing whether the adjustment applies, we must determine that a position of trust existed, and that the position of trust was abused. *See United States v. Thomas*, 315 F.3d 190, 204-05 (3d Cir. 2002).

Fake's role in this fraud, according to the evidence adduced at sentencing, was that of a care-giver to elderly persons who were dependent on the staff of Reaching Out for care. *See App*. at 86. Because he was qualified by the various compensation programs as a care-giver, Fake entered into a trust relationship with the patients he oversaw. *See id*. at 87. Fake was also the bookkeeper and controlled the flow of money provided by patients and the various government programs he defrauded. Thus, applying the *Thomas* framework, Fake was in a position of trust with respect to the compensation programs, as well. *See Thomas*, 315 F.3d at 204. Based on Fake's role in the fraud, the District Court

14

did not err in adopting the PSR's determination that Fake was in a position of trust. As Fake diverted money and medication intended for the patients to his own use and abused and neglected the patients in his care, Fake abused that position of trust. The District Court therefore did not clearly err in applying the § 3B1.3 adjustment.

*E. Obstruction of Justice*

Fake's final challenge is to the applicability of the obstruction of justice adjustment set forth in U.S.S.G. § 3C1.1. According to this section, if a defendant willfully obstructs or impedes an investigation, prosecution, or sentencing, the sentencing court may increase the defendant's offense level by two levels. U.S.S.G. § 3C1.1. At the sentencing hearing in this case, Agent Brockman testified that Fake first became aware that he was under investigation on February 10, 2005, when a search warrant was executed at Reaching Out. *See App*. at 90. Despite the investigation, Fake continued to prepare false time sheets, according to the evidence in the record. *See id*. at 90-91. Fake moved the signature stamps, which he used to falsify the time sheets, to his residence, and they were only discovered when agents searched Fake's home. *See id*. at 92-93. At the sentencing hearing, Fake denied abusing or neglecting the patients, despite the fact that he pled guilty in Lebanon County court to doing so. *See id*. at 150-55. Fake also disputed the hours and time sheets that he signed, arguing that he was not responsible for the fraudulent activity despite the fact that he was pleading guilty. *See, e.g., id*. at 156-58. Additionally, the District Court found Fake's testimony and denials incredible. *See id*. at 180. Thus, there is sufficient evidence in the record to support the District Court's

15

conclusion that Fake obstructed justice by concealing evidence, falsifying records, and making false or misleading statements to the District Court. *See* U.S.S.G. § 3C1.1, cmt. n.4. The District Court did not clearly err in adjusting Fake's sentence upward pursuant to § 3C1.1.

IV.

We have considered all other arguments made by the parties on appeal, and conclude that no further discussion is necessary. For the foregoing reasons, the conviction and sentence of the District Court will be affirmed.