

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-25-1997

# United States v. Monostra

Precedential or Non-Precedential:

Docket
96-2050

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"United States v. Monostra" (1997). *1997 Decisions.* Paper 229.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/229

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 25, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-2050

UNITED STATES OF AMERICA

v.

ALFRED MONOSTRA, III,
        Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Criminal No. 96-00116)

Argued on July 23, 1997

Before: SCIRICA and NYGAARD, Circuit Judges, and
DEBEVOISE, District Judge*

(Opinion filed September 25, 1997)

Anita D. Eve, Esq. (Argued)
Office of the U.S. Attorney
615 Chestnut Street
Suite 1250
Philadelphia, Pa. 19106

Counsel for Appellee

_____

*The Honorable Dickinson R. Debevoise, Senior District Judge for the
District of New Jersey, sitting by designation.

        Thomas A. Bergstrom, Esq.
        (Argued)
        138 Davis Road
        Malvern, Pa. 19355

        Counsel for Appellant

OPINION OF THE COURT

NYGAARD, Circuit Judge:

Alfred Monostra, III, appeals his conviction on one count of bank fraud, arguing that he was indicted under the wrong subsection of 18 U.S.C. S 1344. Because we find that indictment under subsection (1) of the statute was not erroneous, we will affirm the conviction.

Monostra also challenges the addition of two points to the calculation of his sentence under U.S.S.G. S 3A1.1, because the president of the company he victimized was visually impaired. We agree that the district court erred by imposing the "vulnerable victim" enhancement, for the reason that the record lacks any evidence that the president's visual impairment facilitated Monostra's scheme. Consequently, we will vacate the sentence. On remand, the district court may conduct further factfinding to determine whether the company itself was a "vulnerable victim" or if Monostra did, in fact, take advantage of Landis' impairment.

I. FACTS AND PROCEDURE

Diverse Technical Lines, Inc., is a small, closely-held corporation that primarily sells group health insurance plans to other small businesses. Diverse Technical Lines administers the plans by billing the customers, collecting the premiums and forwarding the premiums to the insurance providers. Diverse Technical Lines' president, David T. Landis, decided that the company needed an individual with an accounting background to run the finance department, which collected and dispersed the premiums. He hired Alfred Monostra, a young man with a

college degree in business administration who claimed to have earned a master's degree as well.

Soon after assuming his duties at Diverse Technical Lines, Monostra embarked on a scheme to steal money from the company. Diverse Technical Lines maintained two corporate accounts with Cheltenham Bank and one with Core States Financial Corporation.1 Both institutions were FDIC insured. Although Landis and company vice-president Michael J. Foley were the only individuals with signature authority over the bank accounts, the checkbooks were kept by the bookkeeper, who sat next to Monostra, and Monostra was authorized to prepare some checks for signature by Landis and Foley. Between March 1993 and September 1994, Monostra wrote fourteen checks on Diverse Technical Lines' accounts with Cheltenham and Core States for amounts totaling $657,160.69, and forged Landis' signature on them. The checks were made out to "ABM Enterprises," a fictitious entity, and deposited into

Monostra's personal bank account at Meridian Bank.
Monostra avoided detection until September 1994 by
removing the canceled checks when they returned to
Diverse Technical Lines, writing "VOID" on the
corresponding check stubs, and delaying the payment of
premiums to the insurance providers so that those funds
would be available to cover the forged checks. When the
scheme was eventually uncovered by an alert employee in
the finance department, Monostra confessed to Landis and
Foley that he had stolen the money, and returned
$239,000.

A grand jury indicted Monostra on one count of bank
fraud under 18 U.S.C. S 1344(1) and one count of interstate
transportation of stolen checks under 18 U.S.C. SS 2 &
2314. The United States subsequently dropped the second
charge. Monostra waived his right to a trial by jury. By
order of June 24, 1996, Monostra was found guilty of bank
fraud. A motion for judgment of acquittal was denied on the
same day.

The presentence investigation report calculated a total
offense level of seventeen, including a two-point

_____

1. Core States acquired Cheltenham Bank in June 1994.

enhancement under U.S.S.G. S 3B1.3 for abusing a position
of trust, and a two-point reduction for acceptance of
responsibility. The court corrected a mistake in the
calculation of amount of money lost, thereby increasing the
total offense level by one point. The court also added two
points under U.S.S.G. S 3A1.1, finding that Landis was an
unusually vulnerable victim because of his visual
impairment. Monostra was sentenced to thirty-six months'
imprisonment, five years' supervised release, and he was
required to make restitution to Diverse Technical Lines in
the amount of $307,000.

II. LEGAL ANALYSIS

On appeal, Monostra raises two claims. First, he
contends that he was improperly indicted under 18 U.S.C.
S 1344(1). Second, he argues that the record does not
support the two-point enhancement of his sentence for
exploiting a vulnerable victim. Both issues were preserved
below, and we consider each in turn.

A. Bank Fraud

> The federal bank fraud statute states:
>
> Whoever knowingly executes, or attempts to execute, a scheme or artifice --
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. S 1344. Monostra was indicted and convicted under 18 U.S.C. S 1344(1). This was an error, Monostra argues, because he never intended to defraud Cheltenham or Core States of their money or property. Rather, Monostra asserts that he intended to defraud Diverse Technical Lines of money it had in its bank accounts, and that the deposits

4

in those accounts were sufficient to cover the checks he forged. If anything, Monostra urges, he is only guilty of violating 18 U.S.C. S 1344(2), which prohibits schemes to obtain "moneys, funds, credits, assets, securities or other property . . . under the custody or control of[ ] a financial institution."

Monostra assumes that the two subsections of the statute are entirely disjunctive, but analysis of the text as well as the legislative history indicates otherwise. For instance, both subsections prohibit schemes or artifices fraudulently to obtain money or property owned by a financial institution, for as the Supreme Court has stated, the words "to defraud", used in S 1344(1), "commonly refer `to wronging one in his property rights.' " McNally v. United States, 483 U.S. 350, 359, 107 S. Ct. 2875, 2881 (1987) (quoting Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S. Ct. 511, 512 (1924)). Similarly, while not every scheme to defraud will be accomplished with the aid of "false or fraudulent pretenses, representations, or promises," United States v. Schwartz, 899 F.2d 243, 246 (3d Cir. 1990), as prohibited by S 1344(2), the use of such devices may certainly constitute a scheme to defraud under S 1344(1) as well, since fraud is a broad concept that "is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid

dealings in the general life of the community," United States
v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987).

The legislative history of the statute also indicates that
subsection (2) may be regarded in part as a clarification of
subsection (1). The authors of the bank fraud statute
modeled it after the wire and mail fraud statutes, 18 U.S.C.
SS 1341 & 1343. S. Rep. No. 98-225, at 378 (1983),
reprinted in 1984 U.S.C.C.A.N. 3182, 3519. As the
Judiciary Committee noted, "Like these existing fraud
statutes, the proposed bank fraud offense proscribes the
conduct of executing or attempting to execute `a scheme or
artifice to defraud' or to take the property of another `by
means of false or fraudulent pretenses, representations, or
promises.' " Id.; cf. 18 U.S.C. S 1341 ("Whoever, having
devised or intending to devise any scheme or artifice to

defraud, or for obtaining money or property by means of
false or fraudulent pretenses, representations, or promises
. . . ."); 18 U.S.C. S 1343 (same). Since the bank fraud
statute drew important phrasing from the mail and wire
fraud statutes, the history of the latter statutes is relevant
to interpreting the act before us.

In McNally v. United States, the Supreme Court
scrutinized the legislative history of 18 U.S.C. S 1341. It
noted that as first enacted in 1872, the mail fraud statute
merely contained a general proscription against "any
scheme or artifice to defraud." 483 U.S. at 356, 107 S. Ct.
at 2879. Then, in 1909, Congress amended the statute by
adding the phrase "or for obtaining money or property by
means of false or fraudulent pretenses, representations, or
promises" after the original phrase "any scheme or artifice
to defraud." Id. at 357, 107 S. Ct. at 2880 (citing Act of
Mar. 4, 1909, ch. 321, S 215, 35 Stat. 1130). The McNally
court concluded that the second phrase was a codification
of intervening Supreme Court precedent[2] added "simply [to
make] it unmistakable that the statute reached false
promises and misrepresentations as to the future as well as
other frauds involving money or property." Id. at 359, 107
S. Ct. at 2881. Thus, when Congress copied the
phraseology of the mail and wire fraud statutes into the
bank fraud statute, it adopted two provisions that never
were intended to be mutually exclusive.

Nevertheless, Congress did not adopt the wording of the
mail and wire fraud statutes in their entirety. Specifically,
the mail and wire fraud statutes do not penalize the
victimization of specific persons; rather, they are directed at
the instrumentalities of fraud. In contrast, the bank fraud

statute was expressly "designed to provide an effective vehicle for the prosecution of frauds in which the victims are financial institutions that are federally created, controlled or insured." S. Rep. No. 98-225, at 377, 1984 U.S.C.C.A.N. at 3517. The two subsections of the statute

_____

2. Specifically, the case of Durland v. United States, 161 U.S. 306, 16 S. Ct. 508 (1896) (holding the statute must be read to include "everything designed to defraud by representations as to the past or present, or suggestions or promises as to the future").

express this in different terms: S 1344(1) prohibits schemes "to defraud a financial institution," while S 1344(2) prohibits schemes to obtain money or property "owned by, or under the custody or control of, a financial institution." The "custody or control" language is not taken from the mail or wire fraud statutes. Monostra would have us readS 1344(1) to pertain exclusively to money or property owned by a financial institution, and read S 1344(2) more expansively to include as well money and property merely in the custody and control of the financial institution.

Monostra's interpretation is not implausible. However, consideration of the bank fraud statute's legislative history suggests that, in this instance, too, subsection (2) may have been intended to clarify the scope of S 1344. The Judiciary Committee report does not explain why the statute contains two subsections or the differences between them. S. Rep. No. 98-225, at 377-79, 1984 U.S.C.C.A.N. at 3517-19. Instead, the report focusses exclusively on the need for a federal statute proscribing bank fraud generally. Id. Previously, such crimes had been federally prosecuted under statutes proscribing mail or wire fraud, larceny or false statement. Id. at 377, 1984 U.S.C.C.A.N. at 3517-18 (citing 18 U.S.C. SS 1014, 1341, 1343, 2113). However, the utility of these statutes had been judicially circumscribed, creating "serious gaps" in federal jurisdiction over frauds against financial institutions. Id. Given Congress' aim of creating a statute that would empower federal prosecutors to pursue all forms of bank fraud, it is evident that S 1344(2) was mainly intended to underscore the breadth of the statute's reach.

Even assuming that Monostra is correct that the phrase "to defraud a financial institution" does not encompass schemes to obtain money or property that are merely in a financial institution's custody or control, Monostra misconstrues banking law when he argues that the money he stole was his employer's property in the custody of

Cheltenham and Core States. It is a fundamental principle of banking law that money deposited with a bank becomes the bank's property. United States v. Henry, 29 F.3d 112, 114 (3d Cir. 1994) (citing, inter alia, In re Prudential Trust Co.'s Assignment, 72 A. 798, 799 (Pa. 1909)). When Diverse

Technical Lines deposited funds in its accounts with Cheltenham and Core States, those banks did not become the custodians of that money; rather, Diverse Technical Lines became a creditor of Cheltenham and Core States in the amount of the deposits. See In re Prudential Trust Co.'s Assignment, 72 A. at 799; Triffin v. Interstate Printing Co., 515 A.2d 956, 958 (Pa. Super. Ct. 1986). By depositing forged checks into his personal bank account, Monostra triggered a transfer of assets that were the property of Cheltenham and Core States. In the most direct sense, Monostra was defrauding these banks of money and property.

The fact that Core States3 may succeed in passing the loss on to Diverse Technical Lines, by subtracting the stolen amounts from its debt to the company, is not dispositive. As we have noted in the past, the government need not show that the banks actually incurred a loss in order to prove a scheme or artifice to defraud. Goldblatt, 813 F.2d at 624 (citations omitted). Exposure to potential loss is sufficient. In this instance, Monostra not only deprived the banks of their property by forging checks, but as the district court noted, the banks may ultimately bear the liability for the loss under 13 Pa. Cons. Stat. Ann. S 3420, if Diverse Technical Lines can show that the banks did not exercise ordinary care in paying the checks under 13 Pa. Cons. Stat. Ann. S 3405(b). The record in this case indicates that Diverse Technical Lines has, in fact, brought suit against Core States for honoring the forged checks.

In summary, we hold that Monostra was correctly indicted and convicted under 18 U.S.C. S 1344(1) because he defrauded Cheltenham and Core States of their property by depositing forged checks into his personal bank account at Meridian, thereby causing a transfer of property owned by Cheltenham and Core States to Meridian.

B. Vulnerable Victim Enhancement

Monostra argues that the district court erred in adding

_____

3. As noted supra, Core States has purchased Cheltenham and so succeeded to its interests.

two points to his sentence for exploiting a vulnerable victim under U.S.S.G. S 3A1.1(b), at least insofar as the enhancement was based on the visual impairment of Diverse Technical Lines president Landis, because the record lacks evidence that Landis' impairment contributed to the success of Monostra's scheme. We agree.

This appeal presents questions of law and fact. On review, the trial court's findings of fact are measured by the clearly erroneous standard, while we give plenary consideration to the court's construction of the guidelines. United States v. Hillstrom, 988 F.2d 448, 450 (3d Cir. 1993).

Monostra concedes that it is not entirely clear why the district court applied the vulnerable victim enhancement. At the sentencing hearing, the government argued that the enhancement should be given because Monostra had exploited a small and vulnerable company that nearly went under because it was not insured against the loss Monostra caused. Portions of the record suggest that the district court rejected this argument. In particular, the court said,

> [W]hile this is a small business, I don't know of businesses who stay in business who can't afford the insurance. That is an expense just like heat, light and other things and there were no safeguards in there. I am not so much impressed with that . . . . It's like a small taxi cab running around without liability insurance. Either park the car or get the insurance. That's my view.

On the other hand, when announcing that the vulnerable victim provision would be applied, the court noted that "your co[mp]troller is . . . very trusted, usually the top financial person in a small business." Therefore, the court may have found the enhancement was appropriate because Diverse Technical Lines' size made it particularly vulnerable. In light of this uncertainty, we will remand the matter to the district court for further factfinding on the issue of whether Diverse Technical Lines was particularly susceptible to Monostra's criminal conduct, or rendered susceptible by Landis' visual impairment. We now append a few comments on the applicability of S 3A1.1 when the

vulnerable victim is an institution or business entity rather than a natural person.

The sole charge on which Monostra was tried and convicted was the bank fraud count discussed supra. Consequently, Diverse Technical Lines was not the victim of the offense of conviction. However, in United States v. Cruz, 106 F.3d 1134, 1136-37 (3d Cir. 1997), we held that the drafters of the Sentencing Guidelines did not intend to limit the application of S 3A1.1(b) to situations in which the vulnerable person was the victim of the offense of conviction. Rather, trial courts may look to all the conduct underlying an offense, using S 1B1.3 as a guide. Id. at 1137.

This case differs from the usual case where a third party's vulnerability has been exploited. In all of the instances cited by the government, the victim of the offense of conviction was an agency or business, while the vulnerable victim was a natural person. United States v. Haggard, 41 F.3d 1320 (9th Cir. 1994) (imprisoned felon who victimized family of missing child by claiming to know the child's whereabouts convicted of perjury and obstruction of justice); United States v. Echevarria, 33 F.3d 175 (2d Cir. 1994) (insurers defrauded by individual who posed as a medical doctor and treated patients); United States v. Lee, 973 F.2d 832 (10th Cir. 1992) (sentence of bank employee convicted of embezzlement could have been enhanced if evidence showed that the customers whose checks she stole were particularly vulnerable); United States v. Yount, 960 F.2d 955 (11th Cir. 1992) (sentence of bank vice-president could be enhanced for exploiting incapacitated individuals although the bank had reimbursed them); United States v. Bachynsky, 949 F.2d 722 (5th Cir. 1991) (insurers and government defrauded by physician who submitted false claims); United States v. Callaway, 943 F.2d 29 (8th Cir. 1991) (Social Security Administration defrauded of benefits by representative payee for disabled infant). Similarly, the commentary to S 3A1.1(b) only provides examples of vulnerable victims who are natural persons. U.S.S.G. S 3A1.1 application note 2 (1995) ("The adjustment would apply, for example, in a fraud case where the defendant marketed an ineffective

10

cancer cure or in a robbery where the defendant selected a handicapped victim.").

Nevertheless, the Sentencing Guidelines do not preclude the application of the vulnerable victim enhancement in instances when the victim was an entity rather than a

natural person. The text of S 3A1.1(b) allows the enhancement "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." While the first clause refers to the characteristics of natural persons, the second clause can encompass a broader range of circumstances, including those pertinent to business organizations.

In our recent Cruz decision, we declared that the purpose of the vulnerable victim enhancement is "to acknowledge that, while most crimes are committed for other motives, in many instances defendants know or should know of their victim's particular vulnerability and are therefore more blameworthy for knowingly or even negligently harming them." 106 F.3d at 1139. A defendant is no less blameworthy for having expressed his evil intentions by exploiting the particular vulnerabilities of a small business, than another would be for having exploited the vulnerabilities of a natural person. For this reason, courts may apply S 3A1.1(b) in instances where the defendant has exploited the particular susceptibility of a business or entity. We express no opinion on the applicability of S 3A1.1 in this instance, but leave that to the discretion of the district court on remand.

We now turn to a fact on which the district court clearly did rely in applying the vulnerable victim enhancement: Landis' visual impairment. At the sentencing hearing, the district judge said that while he was not so impressed by Diverse Technical Lines' lack of insurance,

> I am impressed with the idea that this person comes in as co[mp]troller and he says he has a master's degree which . . . he does not have and the person for whom he works and who has direct responsibility that flows to him is blind . . . . I am impressed with stealing from

11

> a blind man. I think most people think that's a little bit worse than stealing from [a] person who is physically able.

On appeal, Monostra argues that the district court erred both in finding that Landis was "blind" and in applying the enhancement when there was no showing that Landis' alleged impairment contributed to the success of Monostra's scheme to defraud.

Although the record contains scant evidence on the

extent of Landis' impairment, we are satisfied that the district court did not clearly err in finding that Landis was "blind." The court had two opportunities to observe Landis: when he testified at trial and at the sentencing hearing. Although Landis had enough visual capacity to testify at trial that his signature had been forged on the checks entered into evidence, he needed to use a pen light to view the checks. Having observed this and Landis' demeanor generally, the court was in the best position to determine whether Landis was so impaired that he might be particularly susceptible to Monostra's criminal conduct.

Monostra argues that even if Landis had impaired vision, the vulnerable victim enhancement may not be applied absent a showing that Monostra targeted Landis or that Landis' impairment contributed to the success of Monostra's scheme. Monostra is correct that there is no evidence that he targeted Diverse Technical Lines because of Landis' poor vision. However, as we recently held in Cruz, S 3A1.1 does not require that the defendant consciously have targeted the victim because of the latter's vulnerability or susceptibility. 106 F.3d at 1137, 1139. The enhancement may be applied when the defendant knew or should have known of the victim's susceptibility. Id. at 1139. Monostra worked in close proximity to Landis and certainly should have known of Landis' visual impairment.

Nevertheless, we agree that the enhancement may not be applied absent a showing that the victim's vulnerability or susceptibility facilitated the defendant's crime in some manner. Webster's Ninth Collegiate Dictionary (1988) defines the word "susceptible" as "open, subject or unresistant to some stimulus, influence or agency." The

12

word "vulnerable" is defined as "open to attack or damage." Id. Both definitions imply that the weakness of the object contributes to the successful operation of the subject. Thus, the use of the words "susceptible" and"vulnerable" in S 3A1.1 indicates that the enhancement is to be applied when the defendant has taken advantage of the victim's weakness.

This understanding is implicit in our previous discussions of S 3A1.1. For instance, in United States v. Seligsohn, 981 F.2d 1418 (3d Cir. 1992), we affirmed the application of the enhancement, finding that "the defendant's consumer fraud scheme depended in many instances on the inability of elderly homeowners to verify the need to repair or replace [their] roofs," id. at 1426. Similarly, in United States v. Astorri, 923 F.2d 1052,

1054-55 (3d Cir. 1991), we affirmed the district court's finding that two of the victims were particularly susceptible to the defendant's persistent requests for funds because they were the parents of the defendant's girlfriend, whom he entirely supported. In Cruz, the defendant accomplished a carjacking by placing a semi-automatic gun to the head of a twelve-year-old passenger. 106 F.3d at 1135.

Cases outside this circuit which the government has cited in arguing that S 3A1.1 may be applied when the vulnerable person was not the victim of the offense of conviction likewise underscore the need for a showing that the criminal conduct exploited the victim's particular vulnerability or susceptibility. The case most directly on point is Lee. There the court found that the application of S 3A1.1 was clearly erroneous where there was little particularized evidence that the elderly customers whose deposits were embezzled had been rendered unusually vulnerable by their age: the probation officer who testified at the hearing was unable to provide any evidence that the customers were physically or mentally impaired due to their age. 973 F.2d at 834-35. The court of appeals concluded that "there should be a nexus between the victim's vulnerability and the crime's ultimate success" before S 3A1.1 may be applied. Id. at 834 (citing United States v. Moree, 897 F.2d 1329, 1335-36 (5th Cir. 1990)).

13

The Lee court contrasted its facts with those of the Yount case in the Eleventh Circuit. There, the court found that the customers were very old, infirm and incapable of managing their own financial affairs, 960 F.2d at 957, which increased the chances that the defendant's thefts from their trust funds would not be detected, see id. at 958.

Both the Second and Fifth Circuits have had occasion to consider cases of insurance fraud. In Echevarria , the defendant posed as a physician, treated patients and submitted claims to insurers. 33 F.3d at 180. In Bachynsky, a physician submitted false diagnoses to insurance companies and the Department of Defense in order to obtain payment for treatment of conditions not covered by the patients' policies. 949 F.2d at 735. The courts in both instances found that the defendants had exploited their patients' need for treatment to carry out their frauds. 33 F.3d at 180-81; 949 F.2d at 735.

In all of these cases, the defendant took advantage of the victim's vulnerability to carry out the criminal scheme. The enhancement is applied not because the victim draws

sympathy from us because of the infirmity, and we simply wish to express extra odium for the act. It is also because the infirmity rendered the victim susceptible to the crime committed upon him. Regardless of whether the defendant deliberately targeted the victims for their vulnerability, that vulnerability must to some degree contribute to the success of the defendant's scheme.

By contrast, the record here is devoid of evidence suggesting that Landis' visual impairment facilitated Monostra's scheme to defraud the banks and Diverse Technical Lines. First, it is uncontroverted that Monostra did not present the stolen checks to Landis for signature, in the hope that Landis would not know what he was signing. All the evidence suggests that Monostra simply signed Landis' name without authorization. Second, there is no indication in the record that Landis reviewed Diverse Technical Lines' canceled checks or financial records, or that Landis would have done so if not for his impairment. Diverse Technical Lines vice-president Foley testified that he was well acquainted with Landis' signature, yet the

company did not have Foley review the canceled checks or other financial records. Consequently, it does not appear that Landis' impairment enabled Monostra to escape detection longer than he otherwise would have.

Third, in imposing the enhancement, the district court commented on the fact that Monostra had lied about having earned a master's degree in business administration. Here, too, the evidence is lacking that the lie went undiscovered because of Landis' visual impairment. In fact, Landis testified that he had a private investigator look into Monostra's background before Monostra was hired. Monostra's lie succeeded because the private investigator slipped up. It is doubtful that Landis could have determined that the resume contained false information if he had 20/20 vision. Moreover, Foley, who did not have a visual impairment, testified that he assisted Landis with the interviews and could presumably have compensated for any problems Landis experienced due to his vision.

Finally, the record does not indicate that Diverse Technical Lines hired Monostra because of Landis' impairment. Landis testified that he had decided to hire Monostra because he wanted someone with an accounting background to run the company's finance department. The record does not suggest that Landis would have run the finance department if not for his impairment.

Thus, a review of the evidence adduced at trial and the sentencing hearing indicates that Monostra did not target Diverse Technical Lines due to Landis' impairment, nor did the impairment facilitate Monostra's scheme in any respect. Enhancement of the sentence is only appropriate where a victim was "particularly susceptible" to the crime that occurred. There is nothing in this record to suggest that Landis' visual impairment made him or Diverse Technical Lines particularly susceptible to Monostra's embezzling. Consequently, the district court clearly erred to the extent it imposed the two-point enhancement under S 3A1.1 on account of Landis' visual impairment.

III. CONCLUSION

We will affirm Monostra's conviction under 18 U.S.C. S 1344(1), but vacate his sentence and remand for

15

resentencing. The district court may consider any evidence bearing on the particular susceptibility of Diverse Technical Lines when determining whether to reimpose the vulnerable victim enhancement. It may also consider any further evidence the government may have which would show that Landis' visual impairment did, in fact render Diverse susceptible, or otherwise facilitate Monostra's crime.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

16