**UNITED STATES of America,**

v.

**Andre ALEXANDER, Appellant.**

**No. 02–4060.**

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit
LAR 34.1(a) July 14, 2003.

Decided July 17, 2003.

Before McKEE, BARRY, and ROSENN, Circuit Judges.

OPINION

BARRY, Circuit Judge.

On July 12, 2002, appellant Andre Alexander pled guilty to a one-count information charging him with conspiring to transmit threatening communications in interstate commerce in violation of 18 U.S.C. §§ 371 and 875(c). The indictment arose out of Alexander's scheme to extort money from his family to pay his gambling debts. On October 25, 2002, the District Court sentenced Alexander to 46 months imprisonment, a three-year term of supervised release, $2,100 in restitution, and a $100 special assessment. Alexander now appeals, arguing that the District Court erred in applying a two-level sentencing enhancement because Alexander's mother and great-grandmother were particularly vulnerable victims within the meaning of section 3A1.1 of the sentencing guidelines. We have jurisdiction pursuant to 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291 and will affirm.

I.

The charges against Alexander arose from the scheme he devised while gambling in Atlantic City, New Jersey, to extort money from his family to pay his gambling debts. Pursuant to the scheme, Alexander and an accomplice he recruited on the Atlantic City boardwalk made several telephone calls to members of Alexander's family and falsely told them that Alexander was being held by individuals to whom he owed a gambling debt who would hurt or kill him if the family did not pay the debt.

On October 16, 2001, before he had even recruited his accomplice, Alexander placed several calls to his mother, Loretta Kelly, at her home in Los Angeles, California and at her place of employment. Alexander asked his mother to wire him $700 to pay off gambling debts to men who were threatening to hurt him if the debts were not paid. Ms. Kelly wired the $700 to Alexander in Atlantic City that same day.

Alexander again called his mother at work the next day, October 17, 2001, in an effort to obtain another $500. When he was unable to reach his mother, he called her residence and spoke with his 92–year–

old great-grandmother, Bertha White, telling her the same false story that he had told his mother the day before. Ms. White arranged a three-way call between her, Alexander, and Ms. Kelly. Alexander falsely told the women that he was calling from the hospital because the men to whom he owed money had hit him on the head with a hammer. Ms. Kelly immediately wired Alexander the $500.

Later that same day, after already losing the money his mother had wired, Alexander recruited Timothy Hernandez to pose as a debt collector and make more calls to his mother's residence to obtain more gambling money. Hernandez called the residence and spoke to Ms. White. Hernandez told her that Alexander would be hurt unless the family immediately sent an additional $2,100 to satisfy Alexander's debts. Ms. White called Ms. Kelly at work to tell her about the threats and then contacted the police to report that Alexander had been kidnaped.

That evening, the police came to Ms. Kelly's residence and recorded several telephone conversations between Alexander and Hernandez in Atlantic City and Ms. Kelly, Ms. White, and Ms. Kelly's cousin, Rene Childress, in Los Angeles. Over the course of these conversations, Hernandez threatened to "rough-up" Alexander if the family failed to pay the $2,100. In one of the calls, Mr. Childress got on the line and told Alexander that his mother couldn't speak on the telephone because she had fainted due to her high blood pressure and might have to be taken to the hospital.

During the course of the recorded calls, law enforcement officials determined that the calls were originating from the Sands Casino in Atlantic City. FBI agents in Atlantic City then reviewed footage from the casino's security video cameras, which showed that Alexander was walking around freely in the casino without an escort. Despite the fact that they were informed by the FBI that Alexander did not appear to be in danger and that his story was likely a hoax, the family wired the $2,100 to Atlantic City.

When later confronted by FBI agents, Alexander admitted that the threats to his family were a hoax that he devised to obtain more gambling money, and also admitted that he had approached Hernandez on the boardwalk earlier that day and offered him $200 to act as a debt collector. On July 12, 2002, Alexander pled guilty to a one-count information charging him with conspiring to transmit threatening communications in interstate commerce, in violation of 18 U.S.C. §§ 371 and 875(c).

At his sentencing hearing on October 25, 2002, Alexander objected to the recommendation in the pre-sentence investigation report that the District Court apply a two-level enhancement because he knew or should have known that his mother and great-grandmother were particularly vulnerable victims, as defined in section 3A1.1 of the sentencing guidelines. The District Court rejected Alexander's arguments and applied the two-level enhancement. In doing so, the Court found that Ms. Kelly and Ms. White were vulnerable victims "not only based on their relationship and kinship to the defendant, but due to their respective physical conditions and ages." The District Court emphasized that "the strong familial bond between Alexander and the victimized family members made them particularly susceptible and vulnerable to the crime in this case."

Applying the two-level vulnerable victim enhancement, in addition to other enhancements not challenged by Alexander on appeal, the District Court concluded that Alexander's total offense level was 15, which, combined with his career offender criminal history category of VI, resulted in a guide-

line range of 41 to 51 months. As noted above, a 46 month term of imprisonment was imposed. Alexander timely appealed.

## II.

The only issue raised by Alexander is whether the District Court erred in applying the two-level vulnerable victim enhancement, pursuant to section 3A1.1 of the sentencing guidelines. Alexander argues that the District Court's finding that the close familial bond between Alexander and the victims of his extortion scheme—his mother and great grandmother—was insufficient, standing alone, to support a finding that they were vulnerable victims for purposes of the enhancement. The District Court's legal interpretation of the sentencing guidelines is subject to plenary review, *United States v. Monostra*, 125 F.3d 183, 188 (3d Cir.1997), while we review its findings of fact and its application of section 3A1.1(b)'s vulnerable victim enhancement to the facts for clear error. *See United States v. Zats*, 298 F.3d 182, 185 (3d Cir.2002) (finding that the Supreme Court's mandate in *Buford v. United States*, 532 U.S. 59, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001), that courts of appeals "shall give due deference to the district court's application of the guidelines to the facts" requires that courts of appeals apply clear error standard to district court's application of section 3A1.1(b) to the particular facts of a case).

Section 3A1.1(b) of the guidelines provides for a two-level enhancement in a defendant's offense level "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." Application note 2 to section 3A1.1 defines a "vulnerable victim" as "a person ... who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." Note 2 emphasizes that, for the enhancement to apply, the defendant must have targeted the victim because of an unusual vulnerability. Thus, "[t]he adjustment would apply ... in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim," but would not apply where "the defendant sold fraudulent securities to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank." U.S.S.G. § 3A1.1, cmt. (n.2) (Nov.2002).

In *United States v. Iannone*, 184 F.3d 214 (3d Cir.1999), we held, in light of the commentary to section 3A1.1(b), that the vulnerable victim enhancement "may be applied where: (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was 'a nexus between the victim's vulnerability and the crime's ultimate success.' " *Id.* at 220 (quoting *United States v. Monostra*, 125 F.3d 183, 190 (3d Cir. 1997)). In making these determinations, we have emphasized that "[t]he correct test for vulnerability calls for an examination of the individual victim's ability to avoid the crime rather than their vulnerability relative to other potential victims of the crime." *Zats*, 298 F.3d at 188.

Applying the three-step analysis outlined in *Iannone*, the District Court concluded that both Ms. Kelly and Ms. White were vulnerable victims. In the first step of the analysis, the Court found that the women were particularly vulnerable "not only based upon their relationship and kinship to the defendant, but due to their respective physical conditions and ages"—

that is, Ms. Kelly's high-blood pressure that induced fainting during one telephone call, and the fact that Ms. White was 92 years old at the time of the offense. The District Court noted that "[t]he fact that a defendant's family member is the victim of a defendant's crime does not *per se* warrant a vulnerable victim enhancement. On the unique facts of this case, however, the strong familial bond of Alexander's family made them particularly vulnerable to his criminal entreaties."

As for the second *Iannone* step, the District Court found that it was clear that Alexander knew of Ms. Kelly's and Ms. White's particular vulnerability. The Court found that Alexander targeted Ms. Kelly and Ms. White specifically because of their close familial bond. The Court further noted that Alexander knew of his mother's high blood pressure because she told him that her blood pressure was up during one of the calls, and actually fainted during another call. Finally, at the third *Iannone* step, the District Court found that Ms. Kelly's and Ms. White's unusual vulnerability facilitated Alexander's crime. The Court stated that "Alexander would not have been able to manipulate his family into complying with his extortionate demands if it were not for the fact that he knew, based on his family's concern for him, that he could succeed."

Having carefully considered the grounds articulated by the District Court for its application of the two-level enhancement, we will affirm Alexander's sentence. The District Court clearly articulated the appropriate three-step analysis mandated by *Iannone,* and each of its findings of fact was clearly supported by the transcripts of the recorded telephone calls themselves. Accordingly, neither these factual findings, nor the District Court's application of the language of section 3A1.1 to these facts, were clearly erroneous.

We are unpersuaded by Alexander's argument that the District Court improperly relied on the strong familial bond between Alexander and his mother and great-grandmother *alone* in finding that the enhancement applied. Such a finding would most likely have constituted clear error. *See,* for example, *United States v. Crispo,* 306 F.3d 71, 83 (2d Cir.2002) (holding that a finding that the mother of an small child kidnaping victim was a "vulnerable victim" just because she was a single mother would be problematic). Here, however, the District Court expressly relied upon Ms. Kelly's high blood pressure and Ms. White's age, combined with their strong emotional interest in Alexander's well being, in finding that they were particularly vulnerable victims. That was sufficient for the vulnerable victim enhancement to apply.

### III.

For the foregoing reasons, we will AFFIRM the judgment of sentence.