

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-13-2009

# USA v. Dullum

Precedential or Non-Precedential: Precedential

Docket No. 07-4502

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Dullum" (2009). *2009 Decisions*. Paper 1624.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1624

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-4502

UNITED STATES OF AMERICA

v.

JARED DULLUM,

Appellant

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 06-cr-00676)
District Judge: Honorable Susan D. Wigenton

Submitted Under Third Circuit LAR 34.1(a)
January 30, 2009

Before: SCIRICA, <u>Chief Judge</u>, AMBRO,
and SMITH, <u>Circuit Judges</u>

(Filed:  March 13, 2009)

Michael Chazen, Esquire
4400 Route 9 South, Suite 1000
Freehold, NJ   07728-0000

      Counsel for Appellant

Christopher J. Christie
  United States Attorney
George S. Leone
   Chief, Appeals Division
Steven G. Sanders
   Assistant U.S. Attorney
Office of the United States Attorney
970 Broad Street, Room 700
Newark, NJ   07102-0000

      Counsel for Appellee

---

## OPINION OF THE COURT

AMBRO, Circuit Judge

Jared Dullum appeals his sentence of 28 months' imprisonment.[1]  He pled guilty to mail fraud, in violation of

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and

18 U.S.C. § 1341, and bank fraud, in violation of 18 U.S.C. § 1344. Dullum argues that his sentence was procedurally unreasonable, asserting that the District Court erred in misapplying five sentencing adjustments: four enhancements—for a loss amount greater than $30,000, vulnerable victim, abuse of trust, and obstruction of justice; and one deduction for acceptance of responsibility. For the following reasons, we affirm the sentence of the District Court.

## I.    Background

Dullum was a Special Agent with the U.S. Secret Service and an active member of his New Jersey church. Within his church, he served in a senior leadership position, teaching classes and counseling fellow members who were struggling with alcohol and substance abuse.

Two members Dullum worked with in this capacity were Julie DeSacia and Nick Cetrulo, both recovering alcoholics and drug addicts whom Dullum characterized as "a little slow." DeSacia and Cetrulo also struggled financially. DeSacia received a monthly payment from the Plumber's Union Pension Fund and Cetrulo received disability benefits. Dullum also offered to serve as the financial advisor to both persons. In June 2004, DeSacia became very ill, suffering from physical and mental effects of cirrhosis of the liver. According to Dullum,

18 U.S.C. § 3742(a).

DeSacia told him that she wanted Cetrulo to be provided for upon her death. Dullum prepared a will and associated trust, but DeSacia never signed the documents before she died.

## A.    The Forged Will

After DeSacia died intestate in January 2005, Dullum forged DeSacia's signature on the will and trust, backdating both documents to 2004. The will purported to name Dullum the executor of the estate and Cetrulo the primary beneficiary. Representing himself as executor, Dullum got the Pension Fund to send him a check for $29,352.76, which was DeSacia's lump-sum payout. He deposited the check into an estate bank account he had opened, and then transferred the proceeds to his personal account.

Dullum did not inform DeSacia's family that he was acting as executor. He told Cetrulo that the will named Cetrulo as the estate's primary beneficiary. Yet Dullum only gave Cetrulo an amount less than $8,000, which he represented as the full proceeds of the estate.[2] Dullum later admitted that he paid

---

[2]At the sentencing hearing, a Secret Service agent involved in the investigation who had interviewed Cetrulo explained that, although Dullum paid Cetrulo approximately $8,000, the latter "gave [Dullum] back [$]8,500" based on a list Dullum created purportedly to repay him for "toys" and other things. Thus, the overall loss to Cetrulo was approximately $500. According to

Cetrulo to stop him from "pressuring me for my help" and asking questions about the will. He also told the estate's creditors that the estate had little or no money, so it could not pay most of its outstanding debts.

The Secret Service began an internal investigation concerning these issues in July 2005, after Dullum's bank communicated with the agency to report suspicious activity involving his accounts. When agents questioned Dullum about the bank transfer from the estate's account to his personal account, he claimed that DeSacia had rented his beach house. In support of this contention, he produced a fabricated $20,000 promissory note made out to him and purportedly executed by DeSacia.

### B.     The Bank Fraud Scheme

Dullum owned rental property at the New Jersey shore. In May 2005, Tony Woods emailed Dullum and expressed interest in renting the property. Woods sent Dullum a rent check for $10,500.87 in the name of Reverend Frank Mirocco from the National Bank of Coxsackie. Dullum suspected that this check was fraudulent because he had personal and professional experience with this type of fraud. Yet he still deposited the check into the estate bank account.

---

the agent, Dullum could not produce or replicate the list and it "did not seem like it was going to add up to [$]8,500."

5

After depositing the check, Dullum emailed Woods and falsely claimed that he had not received the rent check. He asked Woods to send a new check made out to DeSacia, whom he claimed was his wife. Woods sent him another check for $10,000.35 in the name of Reverend Mirocco, which Dullum also deposited in the estate account. After both checks cleared, he immediately transferred the proceeds to his personal bank account.

The drawee bank returned both checks to Dullum's bank as fraudulent. His bank froze his accounts and filed a Suspicious Activity Report with the Secret Service. Dullum repaid the bank the amounts for the two checks, though only after the bank had frozen his accounts and the Secret Service had interviewed him on three occasions as part of its investigation. The third interview occurred just two days before he wrote a check to the bank replacing the funds.

### C. Indictment and Sentencing

In August 2006, a federal grand jury indicted Dullum on one count of mail fraud and one count of bank fraud. He pled guilty to both counts. The Presentence Report prepared by the Probation Office (the "PSR") calculated Dullum's total federal Sentencing Guidelines offense level under the U.S. Sentencing Commission Guidelines Manual (hereinafter "Guidelines" or "U.S.S.G.") as follows:

| | |
|---|---|
| Base offense level | 7 |
| Loss of $39,254.11 | +6 |
| Vulnerable Victim | +2 |
| Abuse of Trust | +2 |
| Obstruction of Justice | +2 |
| Acceptance of Responsibility | -3 |
| | — |
| Total Offense Level | 16 |

The PSR set Dullum's advisory Guidelines range at 21 to 27 months' imprisonment.

At the sentencing hearing, Dullum objected to all four Guidelines enhancements, arguing that this total offense level should be 8 (7 plus, as noted below, 4 for the loss less 3 for acceptance of responsibility). The District Court overruled his objections. The Court adopted the PSR except for the recommended three-level acceptance-of-responsibility deduction. In accord with the Government's position, it found that Dullum's post-plea statements failed to show that he truly accepted responsibility. It awarded him only a one-level reduction for avoiding a trial and pleading guilty. Thus, his total offense level was 18, with an advisory Guidelines range of 27 to 33 months' imprisonment. The Court discussed the 18 U.S.C. § 3553(a) factors and then sentenced Dullum to 28 months' imprisonment and 3 years' supervised release, along with $29,253.76 in restitution and a $40,000 fine.

## II. Analysis

### A. Loss Amount Enhancement

We review the District Court's factual findings for clear error. *United States v. Grier*, 475 F.3d 556, 561 (3d Cir. 2007) (*en banc*). This applies to the loss calculations Dullum complains of under Guidelines § 2B1.1. *See United States v. Ali*, 508 F.3d 136, 143 (3d Cir. 2007) (citing *Grier*, 475 F.3d at 570). Section 2B1.1 is the Guidelines section applicable to Dullum's fraud offenses. U.S.S.G. § 2B1.1 ("Larceny, Embezzlement, and Other Forms of Theft . . . ."). This section sets his base offense level at 7, which he does not dispute. Subsection 2B1.1(b)(1) lists enhancements to the base offense level that depend on the amount of loss.

Dullum argues that the District Court erred in applying a six-level enhancement under Guidelines § 2B1.1(b)(1)(D) for a loss amount greater than $30,000 because his bank fraud scheme caused no loss. If the loss amounts associated with the counterfeit check were deducted from the District Court's total loss finding of approximately $39,000, then the remaining loss for purposes of applying the enhancement would have included only the proceeds of the Pension Fund, or approximately $29,000.[3] Thus, he contends that he should have been subject

---

[3]As we noted in the background section, Dullum cashed two counterfeit checks from Woods for approximately $10,000 each.

8

to a four-level enhancement under Guidelines § 2B1.1(b)(1)(C), which represents a loss amount of more than $10,000 but less than $30,000.

The commentary to the enhancement portion of this Guidelines section requires district courts to use "the greater of actual loss or intended loss" for fraud offenses. U.S.S.G. § 2B1.1 App. N. 3(A). The "government's burden is to prove intended, not possible, loss if it seeks to increase the guideline levels faced by the defendant under § 2F1.1." *United States v. Geevers*, 226 F.3d 186, 192 (3d Cir. 2000) (citing *United States v. Yeaman*, 194 F.3d 442, 460 (3d Cir. 1999)) (discussing a Guidelines section that was deleted and consolidated with § 2B1.1 in 2001). We have held that, in counterfeit check cases, a "district court does not . . . commit error when, in the absence of sufficient evidence to the contrary, it fixes the [G]uidelines range based upon a presumption that the defendant intended to defraud the banks of the full face amount of the worthless checks." *Id.* at 188.

The fraudulent check amount that Dullum argues should not be included in the total loss for purposes of determining his

<hr>

At the sentencing hearing, the District Court referred only to one check for purposes of determining the loss enhancement. It stated: "[T]here were two checks for $10,000. And based on the plea agreement, and based on the plea, it's conceded we're talking about one check for $10,000."

9

enhancement was the $10,000 rental check he cashed, which served as the basis for the bank fraud count. He admitted, however, that he intended the money to "help out some of [his] financial burdens," including a withdrawal of $7,000 to pay back his home equity line and his intention to use the money to cover any outstanding payments on the rental property if necessary. He only repaid to the bank the fraudulent check amount after a Secret Service investigation had begun and his accounts were frozen. Dullum did not provide any evidence to the contrary at sentencing. *See id.* at 194 (holding that a sentencing judge may consider the face value of deposited checks as "sufficient evidence that it was the intended loss," although it cannot "mechanically" be assumed, and the defendant can then "produce evidence of his or her own in an attempt to convince the court that another figure was intended"); *United States v. Strozier*, 981 F.2d 281, 285 (7th Cir. 1992) ("No evidence presented at the sentencing hearing supported counsel's appraisal of his client's motivations, and we refuse to overturn the district court's sentence on the basis of speculation in the valley of dreams."). This chain of events shows that the District Court did not err in finding that Dullum intended to cause a loss for the full amount of the check.

Dullum also argues that he is entitled to credit for repayment of the loss amount based on Application Note 3(E) to Guidelines § 2B1.1. This Application Note states, however, that a defendant must make his repayment *before* the crime is uncovered. U.S.S.G. § 2B1.1 App. N. 3(E)(i). "The time of

10

detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *Id.* Based on Dullum's own admissions, he repaid the money only *after* the bank detected the fraud, notified him regarding the fraudulent checks, froze his accounts, and the Secret Service began its investigation. Thus, the District Court did not err in finding that this Application Note does not apply to Dullum's situation.

Dullum makes a related argument under subpart (ii) of the same Application Note. *Id.* § 2B1.1 App. N. 3(E)(ii) (prior to the 2006 Guidelines, listed as App. N. 2(E)(ii)). It concerns "the determination of loss under subsection (b)(1)" and applies subpart (E)(ii) to "case[s] involving collateral pledged or otherwise provided by the defendant." *Id.* Dullum contends that the loss associated with the fraudulent check should be reduced to zero because he had other funds in his bank accounts to offset the bad check. There is no case law on this issue in our Circuit. Based on a common sense reading of the Application Note's straightforward language, however, we believe the correct interpretation limits its application to situations involving a traditional notion of collateral, such as fraudulently inducing a bank to issue a secured loan. Dullum's fraud is more akin to theft than the additional risk of loss that he would have incurred if he had pledged his own collateral to secure a loan. We know of no court applying the Note to a circumstance similar to

11

Dullum's. Indeed, the opposite is true. *See United States v. Swanson*, 360 F.3d 1155, 1169 (10th Cir. 2004) (rejecting defendant's claim that "any overdrafts on his accounts were secured by collateral he had previously pledged to the bank on various loans"); *see also United States v. Goss*, 549 F.3d 1013, 1017–18 (5th Cir. 2008) (discussing a credit for loan collateral when calculating loss).

Dullum's bank accounts were not formally pledged as collateral. Further, he did not provide the Court with any evidence beyond his in-court statements that, based on his account agreement, the bank could have taken funds from his other bank accounts to recover the amount lost on the fraudulent check. Nor did he provide any evidence that the other funds unrelated to his mail fraud offense were sufficient to cover any portion of the check amount. In this context, we conclude that the District Court's application of § 2B1.1(b)(1)(D) for a loss amount greater than $30,000, instructing a six-level enhancement, was appropriate.

## B. Vulnerable Victim Enhancement

Dullum next argues that DeSacia and Cetrulo were not vulnerable and were not direct victims, such that the District Court erred in applying a two-level enhancement under Guidelines § 3A1.1(b)(1). The District Court did not err in considering Dullum's actions towards DeSacia and Cetrulo prior to DeSacia's death relevant conduct under Guidelines § 1B1.3

12

calling for the enhancement. *See United States v. Monostra*, 125 F.3d 183, 189 (3d Cir. 1997) (indicating that this enhancement is not limited "to situations in which the vulnerable person was the [direct] victim of the offense of conviction[, but that] courts may look to all the conduct underlying an offense, using § 1B1.3 [relevant conduct] as a guide"); *see also United States v. Zats*, 298 F.3d 182, 184–85 (3d Cir. 2002). Based on the evidence presented to the Court, it found that DeSacia and Cetrulo were vulnerable and that Dullum used their vulnerabilities (including their history of substance abuse, that they were "a little slow," and DeSacia's suffering from physical and mental effects of cirrhosis before her death) to act as their financial advisor and gain access to the financial information needed to follow through on the fraud. *See id.* at 190 (stating that for the enhancement to apply, there must be a showing that the victim's "vulnerability or susceptibility facilitated the defendant's crime in some manner"). There is no question that these circumstances qualify DeSacia as "vulnerable" (even if the direct victim was her estate), and there need only be one vulnerable victim for the two-level enhancement to apply.[4] *See* U.S.S.G. § 3A1.1(b)(1).

---

[4]Cetrulo may have been a vulnerable victim as well, but we need not reach that question because we have determined that the District Court did not err in finding that DeSacia was a vulnerable victim.

13

## C.    Abuse of Trust Enhancement

The District Court found Dullum "abused a position of public and private trust" toward DeSacia and Cetrulo because he was a Secret Service agent and a trusted advisor at church. *See* U.S.S.G. § 3B1.3. The two-level enhancement under the abuse of trust Guidelines section is only applicable to defendants who use their "position of public or private trust . . . in a manner that significantly facilitate[s] the commission or concealment of the offense." *Id.* Dullum argues the Court's findings were not sufficient for this enhancement. He contends that "[w]hatever relationship [he] had with DeSacia or Cetrulo, it was not the type of case contemplated by this particular adjustment." Appellant's Br. 13. In support, he cites to *United States v. Pardo*, 25 F.3d 1187 (3d Cir. 1994), where we discerned no position of trust when the defendant's position as a long-time friend of the bank manager facilitated his defrauding the bank. As whether "defendant occupied a position of trust is a legal question, we review this *de novo*. But we review the District Court's finding that the defendant abused a position of trust for clear error, as this is a factual question." *United States v. Hart*, 273 F.3d 363, 376 (3d Cir. 2001) (internal citations omitted) (emphasis added) (determining that certain stockbrokers were in positions of trust).

"Neither § 3B1.3 nor its applicable Commentary clearly defines what is meant by a position of trust." *Id.* at 375 (internal quotations omitted) (quoting *United States v. Iannone*, 184 F.3d

14

214, 222 (3d Cir. 1999)). *Pardo* set out a three-part test for determining whether a position is one of trust: "(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position." 25 F.3d at 1192. We noted that these factors should be considered in light of the guiding rationale of the section: "to punish 'insiders' who abuse their positions rather than those who take advantage of an available opportunity." *Id.* We recognized that the Application Note to this section refers to these positions in a professional capacity, but stated that "we are unwilling to draw a bright line limiting the abuse of trust increase to the employment relationship." *Id.* at 1190–91 (citing cases from other courts where a mother, babysitter, and stepfather, respectively, were found to be in positions of trust).

Through Dullum's involvement with his church, he formally acted as a teacher, advisor, and counselor to DeSacia and Cetrulo.[5] He spent substantial time with DeSacia and Cetrulo over approximately three years as a trusted church figure of authority, counseling them with respect to their substance and alcohol abuse, and as their financial advisor. In this capacity,

---

[5]During an interview with Secret Service agents, Cetrulo indicated that, in addition to Dullum's position in the church, he further trusted Dullum because he was a Secret Service agent.

15

Dullum had the ability and "'freedom to commit a difficult-to-detect wrong'" in forging DeSacia's will and acting as her executor. *Id.* at 1191–92 (quoting *United States v. Lieberman*, 971 F.2d 989, 993 (3d Cir. 1992)). He was not simply "tak[ing] advantage of an available opportunity." *Id.* at 1192. Regional branches of Dullum's church are led by select congregants. Undoubtedly, in Dullum's senior position, DeSacia and Cetrulo relied on his integrity. He was certainly more than the "friend" in *Pardo*. *See id.* Thus, we hold that Dullum's position was a private position of trust. Further, the Court did not err in finding that Dullum abused that position to apply the two-level enhancement under § 3B1.3.[6] *See* U.S.S.G. § 3B1.3 (requiring that a defendant's abuse of the position of trust "significantly facilitated the commission or concealment of the offense").

## D.     Obstruction-of-Justice Enhancement

Dullum objects to the two-level enhancement for obstruction of justice under Guidelines § 3C1.1. This argument has no traction.[7] During the Secret Service's investigation,

---

[6]Because we have determined that Dullum abused his position of trust in a private capacity, we need not reach whether he also abused that position in a public capacity.

[7]Dullum's subsidiary arguments—that his statements were not under oath and that he was not charged with violating 18 U.S.C. § 1001—are clearly wrong.

16

agents interviewed Dullum three times and he provided five sworn statements under oath attesting to the accuracy of the information he provided. Four of those statements contained lies about the counterfeit checks and how he came to serve as executor of DeSacia's estate. He also provided a forged promissory note to agents during his third interview and failed a polygraph examination. The District Court relied on this information in applying the enhancement.

Dullum thus falls squarely within § 3C1.1, which states in pertinent part:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution . . . of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; . . . increase the offense level by 2 levels.

Application Note 4, titled "Examples of Covered Conduct," sets out "a non-exhaustive list of examples of the types of conduct to which this enhancement applies." The examples specifically attributable to Dullum's actions include "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation," and "providing a materially false statement to a law enforcement officer that

17

significantly obstructed or impeded the official investigation." U.S.S.G. § 3C1.1 App. N. 4(c), (g).

In an attempt to cover up his wrongdoing, Dullum manipulated the truth throughout the investigation by providing several false statements and documents to Secret Service agents. Only after repeated interviews did he more truthfully discuss his actions in his fifth and final sworn statement. Thus, we conclude that this enhancement was hardly an error.

### E.      Acceptance-of-Responsibility Deduction

Dullum's final argument is that he should have received the three-level deduction for acceptance of responsibility recommended in the PSR. *See* U.S.S.G. § 3E1.1. The District Court only reduced his offense level by one because he pled guilty and avoided going to trial. It refused to grant the additional two levels because it found that Dullum did not "clearly demonstrate[] acceptance of responsibility for his offense."[8] *Id*.

---

[8]Section 3E1.1 is set up such that a one-level deduction for avoiding trial under subsection (b) can only be applied if the defendant qualifies for a two-level deduction for "clearly demonstrat[ing] acceptance of responsibility" under subsection (a). Dullum argues that the Court "necessarily had to find him eligible for the reduction" under subsection (a). We doubt this given its strong statements against Dullum's full acceptance of

18

At sentencing, the Court extensively discussed its disdain for Dullum's conduct. It found that he refused to take full responsibility for his behavior based on his pre-sentencing letter to the Probation Office and his statements before the Court. He reiterated that he was just trying to help people and that he "believed he was acting in the best interest of Cetrulo and carrying out DeSacia's wishes." In support of its ruling, the Court stated that the acceptance of responsibility deduction was not a matter of "right." *See id.* App. N. 3 ("[E]vidence of acceptance of responsibility . . . . may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."); *see also United States v. O'Neal*, 969 F.2d 512, 515 (7th Cir. 1992) (affirming denial of acceptance-of-responsibility deduction because "neither the defendant's letter to the probation officer purporting to accept responsibility, nor his written statement purporting to show acceptance of responsibility, recognized that he was at fault and responsible for the kidnapping and resultant batteries. If anything, his statement sought to blame the victim for the crime.").

responsibility at the sentencing hearing. Thus, Dullum may not have been eligible for the one-level deduction the Court granted. While the Government points this out, Gov't Resp. Br. at 41, it simply argues that "Dullum, therefore, cannot claim to have been aggrieved by the District Court's error." *Id.* at 42. We too go no further.

Application Notes 4 and 5 apply to Dullum as well. Note 4 states that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct."[9] U.S.S.G. § 3E1.1 App. N. 4. (As noted, Dullum received a two-level enhancement at sentencing under § 3C1.1.) Note 5 states that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." *Id.* App. N. 5; *see also United States v. Stewart*, 452 F.3d 266, 273 (3d Cir. 2006). In this context, the Court was well within its discretion to vary from the PSR recommendation in granting a one-level deduction.

*     *     *     *     *

We thus affirm the sentence imposed by the District Court.

---

[9]Dullum alternatively claims that the District Court mechanically denied his acceptance-of-responsibility deduction because of the obstruction-of-justice enhancement. To the contrary, the Court did not even mention this Application Note as the basis for its ruling at sentencing.